UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DIANE REOPELLE,

        Plaintiff,

v.                                                         Case No. 14-C-411

CAROLYN COLVIN,

        Defendant.

---

**DECISION AND ORDER**

---

Plaintiff filed this action challenging the decision of the Commissioner of Social Security denying his disability benefits. For the reasons given below, the decision of the Commissioner will be remanded for further proceedings.

**I. Background**

At the time of the hearing, Plaintiff was forty-five years old and had severe impairments involving degenerative spinal and joint issues, carpal tunnel, fibromyalgia, vascular disease, deep vein thrombosis, and asthma. And, at 255 pounds and a body-mass index of 37.7, she was obese. Her medical history revealed frequent treatments for pain in her shoulders, neck, knees, hips, thumb, forearm, elbow, groin and back. Some of the pain stemmed from musculoskeletal causes such as disk protrusions or spinal stenosis, and some was the result of rheumatic causes like fibromyalgia. In addition to the pain, Plaintiff experienced burning and tingling sensations in a number of limbs, and clicking and popping in her knees. She experienced trouble walking, standing, and caring for her young child, whom she had recently adopted. Injections occasionally helped with the pain,

sometimes for as much as two weeks, but Fentanyl patches did not. Three spinal fusion surgeries helped somewhat, but did not meaningfully reduce the pain and other symptoms.

At her hearing, she testified that her past work involved computerized printing and graphics, and during the last four years of her employment she took twelve weeks of medical leave each year, the maximum allowable under the Family and Medical Leave Act. (R. 55.) After one of the surgeries, she developed clots in her leg, which caused pain and required her to wear a compression sock and take blood-thinning medication. At the hearing she appeared with a cast on her left arm, the result of recent surgery for an arthritic thumb, a condition that caused problems gripping and pinching things that she also experienced in her other hand. (R. 59.) She also explained that she saw a therapist for depression and took medication, which helped. (R. 62.) Her pain and other limitations prevented her from lifting her young son and from walking any significant distances. She could stand for fifteen minutes but preferred to be able to "be active up and down," i.e., to have the ability to sit and stand at her own option.

In his written opinion, the ALJ noted the Plaintiff's extensive treatment efforts, including surgeries, medications, chiropractic, physical therapy, yoga, and multiple injections. (R. 29.) Even so, he concluded that her pain had been managed conservatively since the alleged onset date. He noted that two consulting physician reports, including one from a rheumatologist, did not impose any work restrictions and concluded that the Plaintiff would essentially be capable of light work if she could sit and stand as needed. (R. 30.) The ALJ also found that although Plaintiff's physician had supported her disability application, that opinion was contrary to subsequent treatment notes and the consultative reports by the other two physicians. The ALJ also cited a functional capacity evaluation, which showed that Plaintiff could perform light to medium work so long as an

2

appropriate ergonomic setting was made available, i.e., the ability to move around and sit/stand as needed. (R. 31.) Finally, the ALJ noted that the Plaintiff left her last job not because she could no longer perform the work but because she had recently adopted an infant, which is an inherently demanding undertaking. (*Id.*) Ultimately, the ALJ found a residual functional capacity to perform sedentary work that allowed for a change in position (sit/stand) as needed, would not require exposure to environmental irritants, and would not require repetitive, forceful use of the hands. Based on this RFC, the ALJ concluded that the Plaintiff retained the capacity to perform her past work as an artist or prepress operator, both of which are sedentary and did not require forceful use of the hands.

**I. Analysis**

A court will uphold the Commissioner's decision if it is supported by substantial evidence, even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Prochaska v. Barnhart,* 454 F.3d 731, 734–35 (7th Cir. 2006). To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Cannon v. Apfel,* 213 F.3d 970, 974 (7th Cir. 2000). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997).

**A. Vocational Testimony**

Plaintiff first argues that the ALJ's conclusion that Plaintiff could perform her past work was improper because he did not fully evaluate or explain the kinds of abilities required by Plaintiff's past work. Plaintiff underwent a functional capacity evaluation, on which the ALJ relied, and that evaluation concluded that Plaintiff was unable to perform tasks involving repetitive fingering and handling, as well as forceful pinching and grasping. (R. 31.) Based on this and other evidence, the ALJ ultimately imposed an RFC precluding Plaintiff from repeated "forceful" use of her hands.[1]

The problem, according to the Plaintiff, is that the ALJ did not incorporate or address these limitations in the hypothetical questions he asked of the vocational expert (VE). The ALJ's first hypothetical question assumed a claimant who could "frequently as opposed to constantly use the hands . . . bilaterally for handling." (R. 77.) The VE testified that Plaintiff's past work would require *constant* use of the hands, and thus the VE concluded that the hypothetical claimant discussed in the ALJ's first question would not be able to do her past work. The VE noted that *other* jobs might exist in the economy for such a hypothetical person, even if a sit/stand option were required. (R. 78.) In short, the evidence was that Plaintiff's past work would require constant use of her hands, and therefore a Plaintiff who could not constantly use her hands would not be able to perform her past work.

Despite the VE's testimony, the ALJ found that Plaintiff *could* perform her past work. This result was achieved through the ALJ's residual functional capacity finding, which, instead of

---

[1]Contrary to the government's assertion, a restriction precluding repetitive, forceful use of the hands is *less* restrictive than one precluding repetitive or constant use of the hands. Had the ALJ imposed an RFC *more* restrictive than the hypothetical question, remand would be warranted.

4

precluding constant use of the claimant's hands—as in the hypothetical posed to the VE—prevented her only from repetitive and "forceful" use of her hands. (R. 30.) The Plaintiff's central argument is that there was no evidence as to whether Plaintiff's past work would have required "forceful" hand use or not. The VE did not opine as to whether the use of the hands in Plaintiff's past work was "forceful." (R. 77.) The ALJ simply noted that "there was nothing to indicate that" the past work would require forceful use of the hands, and the Plaintiff claims this conclusion was based merely on a hunch rather than actual evidence.

But the ALJ did not leave it at that. He went on to note that "[t]he one job is graphic only, and the other job is computer-oriented; and it is notable that claimant's reported day-to-day activities include working on art (mosaics) and using the computer." (R. 32.) Thus, it was not a mere "hunch" that past work did not involve forceful use of the hands. The ALJ reasonably concluded that graphic and computer jobs, by their very nature, cannot be expected to require "forceful" use of the hands. In an ideal world a question would have been posed to the VE on that point, perhaps, but a conclusion that graphic art and computer work does not require forceful use of the hands is not the kind of speculation or "hunch" that would require remand.

Another factor underlying the ALJ's conclusion that Plaintiff could perform her past work was his belief that her past work allowed for a sit-stand option. The Plaintiff questions how the ALJ reached that conclusion, given that the question was not posed specifically and directly to the VE. The ALJ asked a lengthy hypothetical question to the VE, in which he asked the VE to assume a number of limitations: the hypothetical individual could lift 20 pounds, stand and walk for four hours, occasionally climb ramps and stairs, and would need to avoid extreme cold, hazards, and could be off-task for up to ten percent of a workday. (R. 77.) This hypothetical individual could

5

frequently use her hands but not constantly. As noted above, the VE testified that such a person could *not* perform the claimant's past work due to the fact that the past work required constant use of the hands.

The ALJ's hypothetical question did not ask about a sit-stand option, however, and so there was never any evidence from the VE or elsewhere that the claimant's past work allowed such an option. As I found above, it might have been acceptable for the ALJ to assume that the past work did not require forceful use of the hands, because that is a conclusion reasonably based on common sense and experience. But there is no similar corollary here. A layperson would have no basis to conclude that jobs running computers to operate graphics programs or pre-press operations would, by their very nature, allow the operator to stand up whenever she felt like it, and the ALJ did not explain why he believed the past work would include a sit/stand option. In fact, the limited evidence on the subject is to the contrary. In discussing the Plaintiff's past work, the ALJ asked "why have you not returned to work since [2009]?" The Plaintiff responded that she was "more comfortable being at home where I'm allowed to change positions." (R. 51.) The obvious inference is that at her past work she was *unable* to change positions. And previously, she had testified that she left her last position, in part, because "it was very painful to sit at a desk." (R. 50.) Again, the implication is that her past work required sitting rather than allowing moving around. Finally, the examination notes from Dr. Leonard underscore the problem with her past work. "She last worked in April 2009. . . . She states that this job was all done while sitting. She was just miserable at this job. She states she had to sit for nine hours at a time." (Tr. 246.) Thus, because the evidence demonstrates that Plaintiff's actual past work as a pre-press technician did *not* include a sit/stand option, the ALJ could not reasonably assume that such positions generally would include such an

6

option. In essence, the ALJ implicitly found that Plaintiff's past work was doable because it had a sit/stand option, when in fact the evidence suggested just the opposite.

The government argues, very briefly, that such error might be harmless because the VE testified about other jobs in the economy that do include sit/stand options. But the ALJ did not get that far, instead concluding at step four that the Plaintiff could do her past work. "Had the ALJ conducted a step-five analysis to determine whether Mr. Getch could perform other jobs in the national economy, the error might be harmless. Nevertheless, he did not to do so here, and we cannot fill that gap." *Getch v. Astrue,* 539 F.3d 473, 481 (7th Cir. 2008). Accordingly, remand is required to determine whether Plaintiff's past work included a sit-stand option (or, alternatively, whether other jobs exist in the economy that do include such an option).

**B. Other Arguments**

Because I found that remand was required, it would not be necessary to address all of the Plaintiff's other arguments. *See, e.g., Kobal v. Colvin,* 2015 WL 148579, *3 (N.D.Ill. January 09, 2015). Even so, because the remand ordered above is potentially of a limited nature (given the likely existence of other jobs in the economy being sedentary with a sit/stand option), it is worthwhile to address the crux of the Plaintiff's remaining arguments, the centerpiece of which involves the ALJ's consideration of the treating source and his adverse credibility finding.

The treating physician, Dr. Van Sistine, concluded Plaintiff was "gainfully unemployable" (R. 454) due to her spinal problems. The ALJ did not afford this opinion controlling weight because he found it inconsistent, "as to function", with the consultative reports by Drs. Leonard and Partain. Dr. Leonard, who spent more than an hour with the claimant, had found, for example, that Plaintiff had the ability to pass a brief manual dexterity test involving the handling of coins, that her motor

7

and grip strength was normal, and that her mobility was "good" and she could bend and get up from a chair normally. (R. 247.) Dr. Leonard believed she could sit for two hours and then would have to get up to move around "a little bit" to prevent stiffness. In short, Dr. Leonard's opinion is consistent with an RFC of sedentary work with a sit/stand option. Although the opinion may or not be consistent with light work (as the ALJ concluded), that is irrelevant because the ALJ was simply citing it as evidence contrary to the treating source's opinion that Plaintiff could perform *no* work.

The ALJ also cited other reasons for discounting Dr. Van Sistine's report, including the opinion of the state agency consultant, Dr. Cohen, who found her capable of sedentary past work. The ALJ also cited the functional evaluation Plaintiff underwent, which concluded Plaintiff could perform "light to medium" work. (R. 758.) Again, the Plaintiff criticizes the ALJ for believing that the functional evaluation concluded she could perform light work, when in fact the report was slightly more nuanced than that. (It concluded Plaintiff could essentially perform light work for a 5-6 hour day and would need some accommodations to work longer than that. (R. 761.)) But the important distinction here is not between light and sedentary work, it is between sedentary work and *no* work. Once again, the ALJ was simply citing the functional evaluation as more evidence that was contrary to Dr. Van Sistine's opinion that Plaintiff could not work at all. As discussed below, the ALJ's reference to Plaintiff's daily activities may have been error, since the light tasks she engages in do not speak to her ability to work full-time. But by and large, the ALJ properly discounted the opinion of Dr. Van Sistine, citing multiple instances where it was inconsistent with the record.

The ALJ found the Plaintiff's testimony, in the standard boilerplate parlance, "cannot be considered fully credible, to the extent they are inconsistent with the above residual functional

8

capacity assessment." (R. 30.) Beyond that, the ALJ did not expressly make any findings as to credibility. It can be inferred, as both sides do, that the ALJ relied in part on Plaintiff's daily activities, which he cited as undermining Dr. Van Sistine's opinion and which he noted at step three. Yet Plaintiff's activities were so meager that she was only barely more active than an invalid. The ALJ cited the fact that she managed her personal care, prepared meals, cared for a toddler, did dishes, handled money, attended church, went fishing a few times a year, and watched television. (R. 28.) But these kinds of things are only relevant to credibility if the standard for disability is invalidity, that is, if a claimant could only be deemed disabled if she were bedridden and unable to do even the most basic functions. Instead, the standard asks whether someone could work, in a demanding employment setting, for an eight-hour day. Being able to watch television or go fishing a few times a year does not answer that question.

> The administrative law judge expressed doubt about Bjornson's credibility on the further ground of her 'activities of daily living,' notably that she can walk up to one block, sit or stand for up to 15 minutes, lift 10 pounds, bathe and dress normally, and even drive and shop. But she had never testified that she was immobilized . . . The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons (in this case, Bjornson's husband and other family members), and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Bjornson v. Astrue,* 671 F.3d 640, 648 (7th Cir. 2012).

In addition, the ALJ cited the Plaintiff's "conservative" treatment, but the lengthy medical record suggests otherwise, with a litany of injections, surgeries, medications, physical therapy, chiropractic, medical doctors, and the like. Truly conservative treatment could undermine credibility because it is suggestive that the problem (e.g., pain) is not as severe as the claimant

9

alleges. For example, if a claimant alleges crippling pain but only takes ibuprofen, one would wonder why she did not seek more aggressive treatment, such as narcotics or other medication. The essential question is therefore a comparative one: we need ask not only what treatment the claimant received, but what treatment *could* the claimant have received (but did not)? Here, the ALJ did not cite any evidence that more aggressive measures could have helped the Plaintiff's pain. We know that the Plaintiff underwent multiple operations, took medication and had injections, but was there something else she could have done? If yes, then her credibility might reasonably be questioned because her failure to take a more aggressive approach could call into question the need for such an approach. But if there was nothing left to do but bear the pain, the nature of her "conservative" treatment is largely irrelevant. After all, many patients on their death beds receive conservative treatment, but that does not mean they are well. Here, Plaintiff underwent countless procedures, and the ALJ even remarked on the size of the medical record. A discussion of these procedures and an analysis of any procedures the Plaintiff *avoided* is crucial if an ALJ is to rely on "conservative" treatment in discounting credibility, at least when the question is not self-evident (as in the ibuprofen example). *Carradine v. Barnhart,* 360 F.3d 751, 755 (7th Cir. 2004) ("What is significant is the improbability that Carradine would have undergone the pain-treatment procedures that she did . . . but also the surgical implantation in her spine of a catheter and a spinal-cord stimulator, merely in order to strengthen the credibility of her complaints of pain and so increase her chances of obtaining disability benefits.") Here, because pain is subjective and is crucial to the claimant's disability claim, it is conceivable that a more searching assessment of her credibility could lead to a different result.

**III. Conclusion**

For the reasons given above, the case is remanded, under sentence four of 42 U.S.C. § 405(g), for further proceedings.

**SO ORDERED** this 19th day of February, 2015.

/s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court